# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| City of Wilkes-Barre | : | |
| | : | |
| v. | : | No. 1145 C.D. 2017 |
| | : | Argued: April 12, 2018 |
| Wilkes-Barre Police Benevolent | : | |
| Association, | : | |
| Appellant | : | |

BEFORE:     HONORABLE RENÉE COHN JUBELIRER, Judge
            HONORABLE ELLEN CEISLER, Judge
            HONORABLE DAN PELLEGRINI, Senior Judge

<u>OPINION NOT REPORTED</u>

MEMORANDUM OPINION BY
JUDGE COHN JUBELIRER                         FILED:  June 4, 2018

The Wilkes-Barre Police Benevolent Association (PBA) and the City of Wilkes-Barre (City) dispute whether their collective bargaining agreement or past practice require certain forms of compensation to be included in the calculation of pension benefits for City police officers.  PBA ultimately grieved the matter, and an Arbitrator sustained the grievance, ordering the City, *inter alia*, to recalculate pension benefits for the bargaining unit members to include the disputed forms of compensation.  The City subsequently filed a Petition to Vacate and Stay the Arbitrator's Award, which the Court of Common Pleas of Luzerne County (common pleas) granted.  PBA now appeals that Order to this Court.  Given the Arbitrator's findings and our limited scope of certiorari, we reverse.

## I. BACKGROUND

### A. *Facts*

The facts of this case are largely not in dispute. PBA represents members of the City's police force up to and including rank of lieutenant. The parties' relationship is governed by a collective bargaining agreement, which includes various memoranda of understanding and interest arbitration awards (CBA, collectively). The parties are also governed by Act 111, commonly referred to as the Policemen and Firemen Collective Bargaining Act,[1] which applies to police and fire personnel.

In 2015, a retiring police officer questioned the computation of his pension. Specifically, he questioned the exclusion of holiday pay from the calculation. Around the same time, two retired police officers received letters from the City advising them that their pensions were improperly calculated because they included forms of compensation that should have been excluded. As a result, the letters advised that the officers' monthly benefit amounts would be reduced and recovery of the overpayment would be sought.

PBA raised the issue with the City. PBA maintained that compensation from working overtime, working holidays, attending court (court pay), and completing the annual Act 120[2] certification (Act 120 pay), (disputed forms of compensation, collectively), was always included in officers' pension calculations and should not have been excluded from these officers' calculations. The City maintained that, pursuant to an interest arbitration award in 2001 (2001 Award) involving other officers, the City ceased including these disputed forms of compensation in pension

---

[1] Act of June 24, 1968, P.L. 237, *as amended*, 43 P.S. §§ 217.1-217.10.

[2] Act of June 18, 1974, P.L. 359, *as amended*, *formerly* 53 P.S. §§ 740-749.1. Act 120 has been repealed and replaced with the Municipal Police Education and Training Act, 53 Pa. C.S. §§ 2161-2171, which includes similar certification requirements for municipal police.

calculations and stopped withholding contributions from the disputed forms of compensation paid to all officers hired after the date of the award. The three officers who questioned their pension calculations that gave rise to the instant matter had been hired after this award.

After trying unsuccessfully to reach an amicable resolution, PBA filed a grievance, contending exclusion of the disputed forms of compensation from pension calculations violated the parties' CBA. Ultimately, a hearing was held before the Arbitrator, at which PBA president Sergeant Phillip Myers testified for PBA and acting director of human resources Nicole Ference testified for the City.

Sgt. Myers testified as follows. In 2007, City employees received a letter explaining their pension benefits and were told that the pension would be calculated based on base pay plus any longevity, acting officers' pay, bonuses, and "other special forms of compensation." (Supplemental Reproduced Record (S.R.R.) at 67b-68b.) PBA contends "other special forms of compensation" includes the disputed forms of compensation. Sgt. Myers also testified that pension calculations performed for various other police officers included the disputed forms of compensation. (*Id.* at 58b-62b.) On cross-examination, he acknowledged, though, that the dates of hire for those officers predated 2001, when the City alleged the calculations changed. (*Id.* at 103b-04b.)

Additionally, Sgt. Myers testified about a number of documents that PBA introduced to support its position that the compensation always was, and should have continued to be, included in the pension calculations. For example, he testified about a grievance in 2005 in which two retirees, both hired before 2001, argued Act 120 pay should have been included in their pension calculations. The dispute ultimately settled, and Paragraph 5 of a Memorandum of Understanding (2005 MOU), which

3

the parties agree is part of their CBA, provided that holiday pay, Act 120 pay, and "other annual or semi-annual payments" were to be included in pension calculations. (*Id.* at 70b-71b.) On cross-examination, Sgt. Myers acknowledged that the 2005 MOU also contains a provision that expressly states that it is not precedential. (*Id.* at 104b.) Sgt. Myers also testified about a number of City ordinances that define "salary" to include "base pay, holiday pay, night shift differential, overtime pay, longevity increments and accumulated annual sick leave buyback." (*Id.* at 72b-73b.) Sgt. Myers also described a number of actuarial reports that were performed every other year between 2009 and 2015, which include "other special forms of compensation" in the explanation as to how pension benefits are calculated. (*Id.* at 83b-86b.) In addition, an independent audit report of the pension plan for the year ending December 31, 2013, defined "pensionable compensation" as including "other special forms of compensation," as did an audit report for the aggregated pension trust for 2016. (*Id.* at 86b-90b.)

Ms. Ference testified that the City did not withhold contributions for officers hired after January 24, 2001. (*Id.* at 123b-24b.) She explained the City viewed the 2001 Award as controlling on whether such compensation was to be included in the pension calculations. (*Id.* at 130b-31b.) The 2001 Award, which the parties agree is part of their CBA, included a provision that "All officers hired after the issuance of this Award shall be entitled to pension benefits not in excess of [T]he Third Class City Code.[3]" (*Id.* at 35b.) Although this award was rendered in 2001, she admitted that the City continued to withhold contributions from the disputed forms of

---

[3] Act of June 23, 1931, P.L. 932, *as amended*, *formerly* 53 P.S. §§ 35101-39701. This version of The Third Class City Code was repealed by Section 2(2) of the Act of November 24, 2015, P.L. 242, No. 67, effective January 25, 2016. The Third Class City Code is now codified at 11 Pa. C.S. §§ 10101-14702. We cite the former version herein because it was in effect at the time of the proceedings. We note, however, that the relevant provisions are substantially the same.

4

compensation up until the April 30, 2002 payroll, including for officers hired after the 2001 Award. (*Id.* at 126b, 128b.)

### B. *Arbitrator's Decision & Award*

On January 6, 2017, the Arbitrator issued his Decision and Award. He found that the City's pension ordinances include the disputed forms of compensation in their definitions of compensation.[4] (Arbitrator's Decision at 6.) He also found that the disputed forms of compensation were included, for a time, in pension calculations and contributions were made on these amounts. (*Id.*) However, following the 2001 Award, the City stopped these practices, but did not amend the definitions of "compensation" in the ordinances to reflect this change. (*Id.* at 7.)

The Arbitrator also examined the 2001 Award between the parties and analyzed whether the benefits sought in the grievance exceed those permitted by The Third Class City Code. The Arbitrator noted The Third Class City Code defined "salary" as "the fixed amount of compensation paid at regular, periodic intervals and from which pension contributions have been deducted." (*Id.* at 9 (quoting Section 4309 of The Third Class City Code, *formerly* 53 P.S. § 39309 (emphasis omitted)).) Because the disputed forms of compensation are paid at rates fixed by the parties' CBA, the Arbitrator found nothing in The Third Class City Code that would prohibit inclusion of the disputed forms of compensation. (*Id.*) He similarly found nothing in the 2001 Award that would have permitted the City to stop withholding

---

[4] There are two pension plans that apply to police officers. The Bureau of Policemen's Relief pension plan applies to police officers hired after July 8, 1976. Participants of that plan are eligible for benefits after 20 years of service and after reaching age 50. The Police Pension Fund plan applies to those hired before July 8, 1976. Participants of that plan are eligible for benefits after 20 years of service, regardless of age. (Arbitrator's Decision at 5.)

contributions on the disputed forms of compensation or stop including them in its pension calculations. (*Id.* at 9-10.)

Having concluded that The Third Class City Code was not violated, the Arbitrator next examined whether the parties' CBA or past practice provide for inclusion of the disputed forms of compensation in pension calculations. With no direct evidence of the parties' intent, the Arbitrator looked at the record for other indicia of intent. First, the Arbitrator examined the 2005 MOU.[5] The City maintained the 2005 MOU was not precedential, as it was intended to resolve a dispute involving the pensions of two employees hired before 2001, whereas PBA argued the 2005 MOU was broader in scope. (*Id.* at 11.) The Arbitrator noted that Paragraph 6 of the 2005 MOU stated it did not have precedential effect, but other parts of it suggested otherwise. (*Id.* at 12.) For instance, the Arbitrator noted that the two grievants involved in that matter were already retired. Yet, the 2005 MOU apparently contained several provisions that would appear to apply to those still in the workforce. As evidence, the Arbitrator referenced a provision providing that "future back pay awards shall be included in the time period earned for pension calculation purposes." (*Id.*) The Arbitrator also cited to a paragraph where "[t]he parties agreed on a methodology for calculating earnings in the last 12 months before retirement." (*Id.*) The same paragraph included a provision providing for calculation if "an officer retires in the middle of a pay period." (*Id.* (emphasis omitted).) The Arbitrator found these situations would not apply to the grievants because they had already retired. (*Id.*) In addition, Paragraph 4 of the 2005 MOU

---

[5] We note that the 2005 MOU, like many of the documents apparently reviewed by the Arbitrator, was **not part of the record** before common pleas or this Court. However, since the parties do not question the Arbitrator's description of the documents at issue, we will rely on the Arbitrator's description. Moreover, because we do not have the text of the 2005 MOU, we know only those facts underlying that dispute that the parties introduced and the Arbitrator discussed.

6

discussed the timing of retroactive wage adjustments that resulted from an Act 111 interest arbitration award or a grievance arbitration award. The Arbitrator found it was unlikely that the two retired grievants would be receiving such wage adjustments. (*Id.*) But "[o]f greatest impact," in the Arbitrator's eyes, was Paragraph 5 of the 2005 MOU, which provided: "Annual sick leave buyback, **holiday pay, Act 120 pay, or other annual or semi-annual payments are eligible for inclusion in pension calculations as they have been in the past**." (*Id.* (emphasis in original) (quoting 2005 MOU ¶ 5).) Again, the Arbitrator found "it is unlikely that the parties would be addressing forms of annual or semi-annual pay for employees who had already retired," such as the two grievants involved in the 2005 MOU. (*Id.*) Based on a reading of the 2005 MOU as a whole, the Arbitrator found "it to extend intentionally to issues beyond those raised by the grievants." (*Id.* at 13.) According to the Arbitrator,

> [t]he [2005 MOU] is the parties' attempt to resolve multiple issues between them regarding pensions in 2005, including the inclusion of the forms of pay in dispute here in pension calculations. More importantly, Paragraph 5 of the 2005 [MOU] recognizes the parties' past practice of including these pay types in pension calculations.

(*Id.*) The Arbitrator found, "at least in the short term," that the City acted consistently with past practice and the 2005 MOU when it had included the disputed forms of compensation in calculating pensions in the past.

The Arbitrator also found noteworthy that the **2007 letters** that went to all City employees included the following provision: "For purposes of calculating your pension, your compensation will be based upon your base pay **plus** any longevity, acting officers['] pay, bonuses **and other special forms of compensation.**" (*Id.* (emphasis in original) (quoting 2007 Statement of Benefits).) The Arbitrator stated

7

that **actuarial valuations** performed every other year between 2009 and 2015 defined "pensionable compensation" as **including other special forms of compensation**, as did independent audit reports for 2012-13 and 2014-15. (*Id.* at 13-14.) All of this served as other indicia of intent and past practice, in the Arbitrator's mind. Based upon the above findings, the Arbitrator concluded that "[t]he record here amply demonstrates that City had a prior practice of including the disputed pay forms in pension calculations." (*Id.* at 16.)

The Arbitrator found the City violated the CBA by failing to: include the disputed forms of compensation in the pension calculations for officers hired after the 2001 Award; "accept pension contributions on these disputed forms of compensation"; "abide by its agreement with [PBA] to include the disputed forms of compensation in" the calculation of pension benefits; "notify [PBA] of its . . . refusal to include the disputed forms of compensation in pension calculations or accept pension contributions on these forms of compensation"; and bargain with PBA over the changes. (*Id.* at 20.) The Arbitrator ordered the City to recalculate the pension benefits of those affected to include overtime, court time, holiday, and Act 120 pay. (*Id.*) The Arbitrator further ordered the City to cease and desist excluding the disputed forms of compensation from pension calculations and cease and desist refusing to accept contributions on these forms of compensation. (*Id.* at 20-21.) Finally, the Arbitrator ordered all affected bargaining unit members to make the appropriate contributions owed on the disputed forms of compensation pursuant to a payment plan that would be negotiated between the parties.[6] (*Id.* at 21.)

---

[6] PBA has never contended that its members do not have to pay the contributions owed and originally proposed a repayment plan.

### C.    *Common Pleas' Opinion and Order*

The City filed a Petition to Vacate and Stay Arbitration Award with common pleas, asserting the Arbitrator exceeded his authority by requiring the City to perform an illegal act, namely, modifying the pension plan without a cost estimate as required by the Municipal Pension Plan Funding Standard and Recovery Act (Act 205).[7]  Common pleas granted the Petition to Vacate.  Common pleas found the Arbitrator's Award "modified the administration of the pension plan as to the treatment of the employees affected by the 2001 Award[;] thus, an Act 205 study was required." (Common Pleas' Opinion (Op.) at 12.)  Common pleas stated the "relevant class of employees" was "those officers hired after the issuance of the [2001] Award" on January 24, 2001. (*Id.*)  Common pleas noted that the City did not withhold pension contributions on the disputed forms of compensation from those employees hired after January 24, 2001, a fact that PBA did not contest. (*Id.* at 12-13.)  This "history of non-withholding [was] critical," in common pleas' opinion. (*Id.* at 13.)  It served as evidence to rebut PBA's claim that the pension plan was not modified by the 2001 Award because the City had, historically, included the disputed forms of compensation in pension calculations. (*Id.* at 14.)  Common pleas stated PBA's "argument overlooks more than ten (10) years of plan administration that **did not include the disputed forms of compensation** for officers hired **after January 2001**, and, instead focuses on officers hired prior to 2001 whose pensions included the disputed forms of compensation." (*Id.* at 14-15 (emphasis added).)  Thus, common pleas found the PBA's arguments were not focused on the "relevant class:  those officers **hired after January 24, 2001**." (*Id.*

---

[7] Act of December 18, 1984, P.L. 1005, *as amended*, 53 P.S. §§ 895.101-895.803.

9

at 15 (emphasis added).) Common pleas found inclusion of the disputed forms of compensation in the pension calculations of other employees was irrelevant. (*Id.*)

Unlike the Arbitrator, common pleas was not swayed by the various documents introduced as exhibits.[8] With regard to the 2005 MOU, common pleas noted that the agreement explicitly stated that it was not intended to be precedential. (*Id.* at 16.) The actuarial reports, common pleas found, "likely relate[d] only to retired officers hired prior to 2001." (*Id.*)

Common pleas "found that the City consistently administered the pension plan in relation to the post-2001 hired officers as not including the disputed forms of compensation." (*Id.* at 17.) As a result, common pleas concluded that the Arbitrator's Award was a pension plan "modification," which required an Act 205 study. (*Id.*) Because no Act 205 study was completed, common pleas held that the Arbitrator exceeded his power by compelling an illegal act, *i.e.*, modification of the pension plan without an Act 205 study, and vacated the Arbitrator's Award. (*Id.*)

PBA now seeks review of that Order, arguing common pleas erred in: (1) "reversing the . . . [A]rbitrator's finding of fact that all the disputed forms of compensation were included in the pension calculation of all prior retiring police officers"; and (2) concluding the "[A]rbitrator exceeded his powers by awarding a modification of [the] police pension plan" without the benefit of an Act 205 study. (PBA's Brief at 4.) PBA asserts common pleas exceeded its narrow scope of certiorari in vacating the Arbitrator's Award. It also argues that there was no

---

[8] As common pleas noted, a number of exhibits that were introduced at the arbitration were **not made part of the record** before it. (Common Pleas Op. at 17.) Accordingly, its review, like ours, was limited to the testimony concerning the documents and the Arbitrator's Decision. Although ideally these documents would be part of the record before us, because the parties do not dispute the accuracy of the Arbitrator's description of the documents, we also proceed with our review.

10

modification of the pension plan since the disputed forms of compensation had been previously included in the pension calculations until the City stopped withholdings in 2001-02. PBA contends it is simply seeking to maintain the *status quo ante*. As evidence, it points to the actuarial reports, all of which were performed after 2001, which define compensation to include the disputed forms. It also points to the pension plan ordinances and the 2005 MOU. Because there was no modification, according to PBA, an Act 205 study was not required, and, therefore, the Arbitrator did not exceed his authority because his award did not require an illegal act or a public employer to do something it cannot otherwise do voluntarily.

The City argues common pleas was correct in concluding that the Arbitrator exceeded his authority. According to the City, it did not withhold contributions from the disputed forms of compensation and did not include them in pension calculations for employees hired after the 2001 Award. Thus, the Arbitrator's Award requiring the City to withhold contributions from the disputed forms of compensation and include them in the pension calculations without the benefit of an Act 205 study was an illegal act that requires reversal.

## II.    ANALYSIS

Our scope of review of grievance arbitration[9] awards is "narrow certiorari," which "limits courts to reviewing questions concerning: (1) the jurisdiction of the arbitrators; (2) the regularity of the proceedings; (3) an excess of the arbitrator's powers; and (4) deprivation of constitutional rights." *Pa. State Police v. Pa. State Troopers' Ass'n*, 656 A.2d 83, 89-90 (Pa. 1995). The parties here stipulated before

---

[9] "'Grievance arbitration' is the arbitration which occurs when the parties disagree as to the interpretation of an existing collective bargaining agreement." *Pa. State Police v. Pa. State Troopers' Ass'n*, 656 A.2d 83, 85 n.2 (Pa. 1995).

the Arbitrator that there were no substantive or procedural defects, and PBA does not assert its bargaining unit members have been deprived of any constitutional rights. Thus, our review is limited to a determination of whether the Arbitrator exceeded his authority.

An arbitrator exceeds his authority if he mandates an illegal act.[10] *Id.* at 90. An arbitrator "may only require a public employer to do that which the employer could do voluntarily." *Id.* Here, common pleas concluded the Arbitrator exceeded his authority by ordering modification of the pension plan without the benefit of an Act 205 study. Because an Act 205 study is required by law before any plan modification, common pleas held the Arbitrator required an illegal act.

Section 305(a) of Act 205 provides: "Prior to the adoption of any benefit plan modification by the governing body of the municipality, the chief administrative officer of each pension plan shall provide to the governing body of the municipality a cost estimate of the effect of the proposed benefit plan modification." 53 P.S. § 895.305(a). The cost estimate must be "complete and accurate" and shall disclose "the impact of the proposed benefit plan, the modification on the future financial requirements of the pension plan and the future minimum obligation of the municipality with respect to the pension plan." 53 P.S. § 895.305(e). In *Shippensburg Police Association v. Borough of Shippensburg*, 968 A.2d 246, 251 (Pa. Cmwlth. 2009), this Court held that modification of a pension plan without an Act 205 study is an "illegal act necessitating vacation" of an arbitrator's award.

Therefore, we must examine whether the Arbitrator's Award was a modification of the pension plan. In reaching its conclusion that a modification occurred, common pleas focused on the City's actions related only to officers hired

---

[10] "'Illegal act[s]'" [are] not synonymous with [] "'criminal act[s].'" *Borough of Nazareth v. Nazareth Borough Police Ass'n*, 680 A.2d 830, 833 n.4 (Pa. 1996).

after 2001 and found that the City did not include the disputed forms of compensation in the pension calculations for those officers. It also found that the City did not withhold contributions for those officers based upon that compensation. Therefore, requiring it to do so now is a modification.

PBA argues no modification took place because the Arbitrator's Award merely required the City to continue doing what it previously did – withhold contributions from the disputed forms of compensation and include them in the pension calculations. The City argues, much like common pleas found, that because it never withheld contributions or included the disputed forms of compensation in pension calculations for officers hired after 2001, requiring it to do so now amounts to a modification requiring an Act 205 study.

Here, the City's change in practice was based upon the 2001 Award, which provides "[a]ll officers hired after the issuance of this Award shall be entitled to pension benefits not in excess of [T]he Third Class City Code." (S.R.R. at 35b.) Section 4303(b) of The Third Class City Code provided, in relevant part:

> The basis of the apportionment of the pension shall be determined by the rate of the monthly pay of the member at the date of the injury . . . or retirement, or the highest average annual **salary** which the member received during any five years of service preceding injury . . . or retirement, whichever is the higher, and . . . shall not in any case exceed in any year one-half the annual pay of the member computed at the monthly or average annual rate, whichever is the higher.

*Formerly* 53 P.S. § 39303(b) (emphasis added). Section 4309 of The Third Class City Code defined "salary" as "the fixed amount of compensation paid at regular, periodic intervals by the city to the member and from which pension contributions

13

have been deducted." *Formerly* 53 P.S. § 39309.[11]  The City understood this to mean that the disputed forms of compensation should not be included in the pension calculations.

However, important to our determination here, are the Arbitrator's findings that the City **took no action** after the 2001 Award to formalize its interpretation, despite multiple opportunities to do so over the course of many years.[12]  Because the City **never formally changed the plan,** the Arbitrator found its past practice of withholding contributions and including the disputed forms of compensation in pension calculations remained intact.  Therefore, his Award did not modify the plan, as common pleas concluded; it simply sought to maintain the status quo.

The Arbitrator cited a significant amount of evidence that supports this conclusion.  First, **the pension ordinances** that govern the plans provide that the disputed forms of compensation are to be included in the pension calculations. (Arbitrator's Decision at 6.)  For example, Section 2-247 of the City's ordinance governing the Bureau of Policemen's Relief pension plan defines "monthly compensation" to include "basic monthly compensation plus longevity payments, acting officers' pay, bonuses and **other special forms of compensation**."  (S.R.R. at 13b (emphasis added).)  Yet, after the 2001 Award, "[t]he applicable pension ordinances were not amended to reflect [the City's] new 'policy'" to exclude those forms of disputed compensation.  (Arbitrator's Decision at 10; *see also id.* at 7

---

[11] This definition is identical to the definition found in Section 14300(b) of the current version of the Third Class City Code, 11 Pa. C.S. § 14300(b).

[12] We reiterate that the 2001 Award was an interest arbitration award.  "'Interest arbitration' is the arbitration which occurs when the employer and employee are unable to agree on the terms of a collective bargaining agreement." *Pa. State Police*, 656 A.2d at 85 n.2.  The 2001 Award is 2 ½ pages long containing 8 separately numbered paragraphs that set forth certain terms and conditions of employment, such as wages, shift differentials, health insurance, Heart and Lung Claims, holiday pay, and personal days.  (2001 Award, S.R.R. at 33b-35b.)

14

("Despite the [2001 Award's] addition to pension provisions in the parties' collective bargaining agreement, the City did not modify either of the ordinances governing the [pension p]lans.").) Thus, "[t]he definitions of compensation contained in those ordinances remained in place after the [2001 Award], and continue to remain in place." (*Id.* at 7.) Moreover, while the ordinances do distinguish between officers hired before **July 1976** and after July 1976, they do not distinguish between officers hired before the 2001 Award and officers hired after the 2001 Award.

Second, the 2007 letter that was sent to plan participants included the following statement: "For purpose of calculating your pension, your compensation will be based upon your base pay **plus** any longevity, acting officers['] pay, bonuses **and other special forms of compensation**." (*Id.* at 13 (emphasis in original) (quoting 2007 Statements of Benefits).) Like the ordinances, there is no evidence that the letter distinguishes between officers hired before the 2001 Award and those hired after.

Third, the **actuarial valuations** that were performed for 2009, 2011, 2013, and 2015, all defined "pensionable compensation" as including "basic pay, longevity payments, acting officers['] pay, bonuses **and other special forms of compensation**." (*Id.* (emphasis in original) (quoting actuarial valuations).) While the actuarial valuations draw a distinction between those hired pre- and post-2001, that distinction relates to computation of the basis for the pension. The actuarial valuations provide:

> If hired before 1/24/01, the average of a member's monthly pensionable compensation for the 12 months (or lesser period of time in case of non job-related disability retirement and member has less than one year of service) immediately preceding a member's retirement or termination. **If hired after 1/23/01, the member's monthly salary rate at time of**

15

> **retirement, or, if higher, 1/12 of the member's average annual salary for his five years of service which produce the highest such average. Pensionable compensation includes** basic pay, longevity payments, acting officers' pay, bonuses and **other special forms of compensation.**

(Arbitrator's Decision at 13 (emphasis in original) (quoting actuarial valuations).)[13] The definition of "pensionable compensation" is not different based upon date of hire.

In short, the Arbitrator found based on evidence in the record, that the City never formally changed the pension plan, as evidenced by the failure to amend the pension ordinances or to distinguish between pre- and post-2001 hires in the 2007 letter or in any of the actuarial valuations that were performed every other year. The Arbitrator found the parties, by agreement and through past practice, included the disputed forms of compensation in pension calculations, and these findings are entitled to deference under narrow certiorari review. Because of our narrow certiorari scope of review, we cannot disregard an arbitrator's findings of fact or contract interpretation so long as the arbitrator is arguably construing or applying

---

[13] The above-quoted language also provides another plausible interpretation as to what was meant by the provision in the 2001 Award that "[a]ll officers hired after the issuance of this Award shall be entitled to pension benefits not in excess of [T]he Third Class City Code." (2001 Award ¶ 7, S.R.R. 35b.) Section 4303(b) of The Third Class City Code provided, in pertinent part,

> The basis of the apportionment of the pension shall be determined by the rate of the monthly pay of the member at the date of injury . . . or retirement, or the highest average annual salary which the member received during the five years of service preceding injury . . . or retirement, whichever is the higher[.]

*Formerly* 53 P.S. § 39303(b). The language in the actuarial valuations that distinguishes between pre- and post-2001 hires closely tracks that of The Third Class City Code. As the Arbitrator notes, "[c]ontrary to the City's arguments, the language of Paragraph 7 [of the 2001 Award] is not clear and unambiguous with respect to the inclusion or exclusion of the disputed forms of compensation in pension calculations. Rather, that language is silent regarding the issue." (Arbitrator's Decision at 10 (internal citation omitted).)

16

the contract and acting within the scope of his authority. *Shippensburg Police Ass'n*, 968 A.2d at 249. Nor is an error of law sufficient to "warrant reversal under the narrow certiorari scope of review." *Pa. State Police*, 656 A.2d at 90.

In vacating the Award, common pleas did not defer to those findings but substituted its own findings for that of the Arbitrator, which it was not permitted to do. This was reversible error. While the City stopped withholding contributions after the 2001 Award, it did nothing to formalize this change. Accordingly, requiring the City to continue including the disputed forms of compensation in the pension calculations and to continue withholding contributions was not a modification to the plan that required an Act 205 study; it was merely consistent with the City's written policy. In light of our narrow certiorari scope of review and, more importantly, the Arbitrator's findings, we are constrained to reverse common pleas and reinstate the Arbitrator's Award.

To the extent that the City relies on *Shippensburg Police Association* and *Muhlenberg Township v. Muhlenberg Township Police Labor Organization* (Pa. Cmwlth., No. 1327 C.D. 2013, filed May 2, 2014),[14] for the proposition that an Act 205 study is required, that reliance is misplaced. In those cases, the arbitration awards required an actual modification of the pension plans at issue; there was no finding of a past practice that included the disputed compensation in the pension calculations, as exists here.

---

[14] *Muhlenberg Township* is an unreported panel decision of this Court, which can be cited for its persuasive value but not as binding precedent under Section 414(a) of our Internal Operating Procedures, 210 Pa. Code § 69.414(a).

17

### III. CONCLUSION

As discussed above, we conclude the Arbitrator's Award was not a modification of the pension plan. Rather, the Award was an attempt to maintain, what the Arbitrator found, was the *status quo ante*. Because the Award was not a modification, an Act 205 study was not required. Therefore the arbitrator was acting within his authority and did not direct the City to perform an illegal act. Common pleas, in substituting its factual findings for those of the Arbitrator, did exceed its authority under the narrow scope of certiorari. Accordingly, common pleas' Order is reversed.

_____
**RENÉE COHN JUBELIRER,** Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

City of Wilkes-Barre                          :
                                              :
                v.                            :    No. 1145 C.D. 2017
                                              :
Wilkes-Barre Police Benevolent               :
Association,                                  :
                        Appellant             :

# **O R D E R**

**NOW**, June 4, 2018, the Order of the Court of Common Pleas of Luzerne County, in the above-captioned case, is **REVERSED**.

_____
**RENÉE COHN JUBELIRER,** Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

City of Wilkes-Barre        :
                      :
        v.             :  No. 1145 C.D. 2017
                      :  Argued:  April 12, 2018
Wilkes-Barre Police Benevolent  :
Association,                :
         Appellant     :


BEFORE:   HONORABLE RENÉE COHN JUBELIRER, Judge
               HONORABLE ELLEN CEISLER, Judge
               HONORABLE DAN PELLEGRINI, Senior Judge


<u>OPINION NOT REPORTED</u>


CONCURRING OPINION BY
SENIOR JUDGE PELLEGRINI               FILED: June 4, 2018


       I concur with the majority.  I write separately because I agree with the Court of Common Pleas of Luzerne County that the arbitrator impermissibly amended the collective bargaining agreement by including overtime, working holidays, court pay and other incidental pay into what is salary for the purposes of calculating pension benefits.  However, because of our narrow scope of review involving police arbitration cases, we can do nothing about it and, therefore, I concur.


                           _____
                           DAN PELLEGRINI, Senior Judge